IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINDA CONSTRUCTION INC.,

               Plaintiff,

     v.

ALLIED WASTE INDUSTRIES,
ALLIED WASTE NORTH AMERICA,
ALLIED WASTE TRANSPORTATION,
REPUBLIC SERVICES, INC.,
REPUBLIC SERVICES
PROCUREMENT, CITY OF CHICAGO,
CPO JAMIE L. RHEE, NATIONAL
CASUALTY COMPANY, RT
SPECIALISTS, INC., SENG LLC,
and KENNETH SENG,

               Defendants.

Case No. 15 C 8714

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are four Motions to Dismiss [ECF Nos. 153, 156, 161, and 163]. For the reasons stated herein, the Court grants the Motions found at ECF Nos. 153, 156, and 163. The remaining Motion [ECF No. 161] is granted in part and denied in part. The Court dismisses Counts I through V against all Defendants with prejudice. Count VI, as narrowed below, survives.

## I. BACKGROUND

The following facts are taken from Plaintiff's Third Amended Complaint (the "TAC") and the documents attached to or

referenced in that Complaint that are critical to it. *See, Geinosky v. City of Chi.,* 675 F.3d 743, 745 n.1 (7th Cir. 2012). The Court accepts as true all well-pleaded factual allegations in the TAC, but where an attached exhibit and the TAC conflict, the exhibit controls. *See, Forrest v. Universal Sav. Bank, F.A.,* 507 F.3d 540, 542 (7th Cir. 2007).

Plaintiff Linda Construction, Inc. ("LCI") is a garbage-hauling business whose owners are African-American. TAC, ¶¶ 2-3. The company is certified as a Minority Business Enterprise ("MBE") by the City of Chicago. *Id.* ¶¶ 2, 5. This designation gives LCI certain advantages when it comes to contracts with the City, which generally requires that a percentage of the work it contracts out be done by MBEs and WBEs (Women Business Enterprises). *Id.* ¶ 16.

In November 2009, LCI entered into an agreement with Defendant Republic Services Procurement, Inc. ("RSPI"). The parties signed an agreement called the "Master Transportation Services Agreement," or "Transport Agreement." Under the agreement, LCI was to send its trucks to locations known as transfer stations and from there pick up garbage and haul it to landfills. *See,* ECF No. 137 ("Transport Agreement") at 3. The Transport Agreement imposed certain conditions on LCI and allowed RSPI to terminate the contract if LCI failed to abide by them. *Id.* at 4-5.

Around the same time that RSPI committed to the Transport Agreement, Republic Services, Inc. ("Republic") submitted a bid for a waste hauling contract with the City of Chicago. TAC ¶¶ 19-20. (LCI is mum as to the nature of the relationship between RSPI and Republic. The Court makes do with the assumption that they are corporate affiliates.) Republic made the bid through a wholly-owned subsidiary that is one of the Allied entities sued in this litigation. Plaintiff sues three such Allied entities – Allied Waste Industries, Allied Waste North America, and Allied Waste Transportation (collectively, "Allied") – and refers to the Allied corporations and Republic as Defendant Republic/Allied. TAC ¶ 9.

The litigation was to come years later, however. In 2009, LCI was one of the companies Allied listed in its bid as a MBE that would work as a subcontractor to transport the City's garbage. TAC ¶ 26. The inclusion of such subcontractors helped to satisfy the City's requirement that a fixed percentage of the contract be performed by MBEs. ECF No. 149, Ex. C at 42.

Allied had run into trouble with the City of Chicago over its MBE/WBE participation in the past. In early 2012, Allied settled a claim with the City over violations that it committed in the period before 2010. The Office of Inspector General ("OIG") released a statement reporting the settlement. As is detailed by the OIG, Allied had participated in a "pass through"

scheme in which the company "arranged for the work purportedly done by the certified MWBE haulers to be done by non-certified hauling firms." ECF No. 149, Ex. E at 1. The OIG excoriated Allied; the MWBE firms, which were "willing participants in Allied's scheme," "essentially selling their certification" for a cut of the contract's price; and the City of Chicago for its poor administration of the program. *Id.* at 1-2. At the same time, the OIG "applaud[ed] Republic for having voluntarily stepped forward, disclosing possible violations and reforming the operation," something the company presumably did after it bought Allied. *Id.* at 2. The OIG concluded its report by making recommendations to the City on how to improve its MWBE program. *See, id.* at 2-4. For example, the OIG recommended that instead of inserting the highest MWBE-participation percentages authorized by law in each contract, the City should set realistic goals based on "how much MWBE capacity actually exists in those areas." *Id.* at 2.

In any case, Allied won the bid it entered. The company and the City of Chicago then signed a contract, the "Main Contract," giving Allied $24 million worth of work over a three-year period beginning on March 19, 2010. ECF No. 149, Ex. C (the "Main Contract"), Contract Summary Sheet. The Main Contract was a hundred-page-plus document that laid out the responsibilities and obligations of the Contractor (Allied) and

the City, as represented by its Chief Procurement Officer ("CPO"). Defendant Jamie Rhee ("CPO Rhee") occupied the CPO position throughout the relevant period.

The Main Contract made references both to the subcontractors and the CPO. For example, Section 2.21 stated: "The Chief Procurement Officer may, whenever he have *[sic]* reason to believe that the Contractor has neglected or failed to pay any subcontractors, workmen or employees for work performed . . ., order and direct that no future vouchers and estimates be issued and no further payments be made upon the contract until said Chief Procurement Officer has been satisfied that such subcontractors, workmen and employees have been fully paid. . . ." Main Contract at 13.

In its latest Complaint, LCI also highlights Section 5.9 of the Main Contract. Section 5.9 governs Arbitration. It reads:

> In the event a contractor has not complied with the contractual MBEs/WBEs percentage in its Schedule D, underutilization of MBEs/WBEs shall entitle the affected MBE/WBE to recover from the contractor damages suffered by such entity as a result of being underutilized; provided, however, that this provision shall not apply to the extent such utilization occurs pursuant to a waiver or substitution approved by the City. The Ordinance and contracts subject thereto provide that any disputes between the contractor and such affected MBEs/WBEs regarding damages shall be resolved by binding arbitration. . . . This provision is intended [to] the benefit of any MBE/WBE affected by underutilization and grants such entity specific third party beneficiary rights.

Main Contract at 49.

Before the contract between Allied and the City even took effect, however, RSPI and LCI began to have problems under their Transport Agreement. On March 18, 2010, RSPI sent LCI a notice letter, apprising LCI of its breach of the Transport Agreement. *See,* ECF No. 149, Ex. A at 1. Although RSPI then attempted to terminate its agreement with LCI, *see, id.*, the parties appear to have worked out their differences afterwards. In July 2010, RSPI and LCI amended their Transport Agreement to extend the contract term through August 16, 2015. *Id.* at 2. The amended Transport Agreement also included an exclusivity clause in favor of LCI. *Id.* § 1(b) at 2.

However, more than a year before the contract extension was to expire, RSPI terminated its agreement with LCI. On April 7, 2014, RSPI sent LCI a termination letter effective immediately. *See,* ECF No. 149, Ex. L. In its letter, RSPI cited three independent grounds for terminating the contract, all of which LCI disputes. *See,* ECF No. 149, Ex. H. These included the contentions that LCI had not paid its union contributions, that LCI had subcontracted work to another trucking unit without obtaining consent from RSPI, and that LCI had become insolvent. *Id. at* 1-3. On this last point, RSPI cited the statement of Jessie McGee, one of LCI's owners. According to RSPI, "Mr. McGee stated that Linda Construction was unable to meet its financial obligations." *Id.* at 3. "Furthermore," said RSPI, "on

March 30, 2014 Republic received the enclosed inquiry from Ken Seng of Seng, LLC, one of Linda Construction's creditors, which provides further evidence of Linda Construction's insolvency. According to Mr. Seng, Linda Construction currently has an unpaid debt to him of around $80,000.00. . . . In his email, Mr. Seng stated that . . . Seng, LLC will repossess the equipment by April 15, 2014." *Id.*

In October 2015, LCI filed this lawsuit, naming RSPI, Republic, Allied, the City of Chicago, CPO Rhee, Ken Seng, Seng, LLC (collectively "Seng"), and others as Defendants. Many of these other Defendants have been dismissed in the year and a half since the suit was filed, but two remain: RT Specialists, Inc. and National Casualty Company (collectively "NCC"). (Again, LCI does not say what the relationship is between RT Specialists and National Casualty Company. Instead, it makes identical allegations, sometimes naming RT Specialists as the alleged perpetrator and sometimes naming National Casualty Company. Since treating the two entities as fungible does not change the substance of this Opinion, the Court proceeds as if RT Specialists and National Casualty Company were one defendant.) LCI alleges that NCC was its insurer, but that in 2014, NCC failed to obtain insurance for LCI to operate in Missouri, raised LCI's premiums, and wrongly retained LCI's deposit. TAC ¶¶ 66-68.

LCI asserts various causes of action against RSPI, Republic, Allied, the City of Chicago, CPO Rhee, Seng, and NCC (collectively "the Defendants"). The nub of the company's grievances is that the Defendants discriminated against it on account of it being owned by African Americans. *See,* TAC ¶¶ 36-37, 46-59, 66, 69. LCI alleges that the Defendants engaged in racial discrimination by taking various adverse actions – either individually or as part of a conspiracy – against LCI that were not taken against "white-owned contracts." *See*, TAC ¶¶ 50-52 ("Defendant Rhee's collusion with Defendants Republic/Allied, Republic, Kenneth Seng, Seng LLC, NCC and RT Specialists to discriminate against LCI was based on racial animus against LCI because LCI's owners are African Americans."), 57, 66, 69. According to LCI, these discriminatory actions provided the pretext for RSPI to terminate its contract with LCI. LCI alleges that but for the Defendants' unlawful actions motivated by racial animus, LCI would have "graduated" from a three-year mentoring effort that Republic/Allied was contractually obligated to give it and thus qualified to bid as a prime contractor for the City's next contract.

On these facts, LCI prays for over $20 million in damages.

## II.  PROCEDURAL HISTORY

This is not the first time that the Court has been asked to dismiss LCI's Complaint. Twice before have the Defendants

briefed their 12(b)(6) motions, and twice before has the Court found it appropriate to dismiss the Complaint in its entirety. Unfortunately for the Defendants, this appears to be a case of "if you first succeed, still you must try and try again." LCI, after one change of counsel, a withdrawal and reappearance of substitute counsel, two dismissals, three amended complaints, and seventeen months of trying to state a claim upon which relief can be granted, brings in its TAC causes of action which rest on allegations that have been rejected as conclusory. The reasons for the previous dismissals thus continue to be relevant for disposition of the current Motions, and the Court covers its prior rulings in some detail.

The Court probed and found wanting LCI's original Complaint in March of 2016. *See,* ECF No. 64 at 25-26. Among the claims dismissed in that ruling were a 42 U.S.C. § 1983 claim brought against the City of Chicago and CPO Rhee, a 42 U.S.C. § 1985(3) conspiracy claim brought against all the Defendants, and a claim for breach of the Main Contract made against the City and Republic/Allied. *Id.* at 14-22.

The § 1983 and § 1985 claims against the City of Chicago were dismissed because LCI did not adequately plead that its civil rights were violated by a City's custom or policy. ECF No. 64 at 15-16. The Court specifically found that the allegations that "the City acquiesced in, or ratified, the

misbehavior of the other Defendants and CPO Rhee" did not amount to a municipal policy because such conduct was not a practice "so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* (citing *Moore v. Bd. of Educ. of City of Chicago,* 300 F.Supp.2d 641, 645 (N.D. Ill. 2004)) (internal quotation marks omitted).

The Court dismissed the same claims brought against CPO Rhee on the additional ground that LCI failed to allege that CPO Rhee's actions were motivated by race. It found that the "allegations as to CPO Rhee's discriminatory motive [were] general and conclusory" and as such, "d[id] not raise a plausible claim of intentional discrimination on the basis of race." ECF No. 64 at 17.

The § 1985(3) civil conspiracy claim asserted against the other Defendants failed for the same reason. ECF No. 64 at 20. As the Court noted, "Plaintiffs' allegations in the body of the Complaint that they were 'treated differently than white owned contractors,' . . . are conclusory at best." *Id.* Such conclusions did not suffice to sustain a cause of action, and the Court pointed out to LCI that it needed to "allege *facts* [to] show[] . . . racial animus on the part of the City or the other Defendants." *Id.* (emphasis in original). In addition, LCI did not make out the elements of a conspiracy since it did not plead any facts tending to show that a "meeting of the minds

occurred between the City and the various Defendants to deprive Plaintiffs of their constitutional rights." *Id.* at 19-20.

LCI's contract claim fared even worse. While the Court gave LCI leave to amend its Complaint as to the other causes of action, it dismissed the contract claim with prejudice because LCI was "not a party to Contract No. 21472 [*i.e.,* the Main Contract], which is between Allied and the City." ECF No. 64 at 21-22. Moreover, LCI and its owners have not alleged "(nor could they in good faith) that they are third-party beneficiaries" of the Main Contract. *Id.* (citing *Cronimet Holdings, Inc. v. Keywell Metals, LLC,* 73 F.Supp.3d 907, 917 (N.D. Ill. 2014)).

Presumably due to the dismissal with prejudice, LCI abandoned the contract claim in its First Amended Complaint. The company hung on to the civil rights causes of action, and the Court again looked to find factual allegations to support them. It looked in vain. Accordingly, the Court dismissed the § 1983 and § 1985(3) claims for a second time. It did so for the same reasons that it did five months before: LCI's Complaint contained no facts from which the Court could infer a municipal policy, racial animus, or a meeting of the minds. *See,* ECF No. 131 at 7-12. The Court further dismissed the § 1981 claim on the ground that LCI failed to support its allegations of race discrimination with any factual pleading.

*Id.* at 5-7. The Court concluded that LCI appeared to allege nothing more than that "because they are black, Defendants' alleged conduct towards them was indisputably due to their race." *Id.* 6. "But saying it is so does not make it so." *Id.*

Throughout its opinion dismissing LCI's First Amended Complaint, the Court exhorted LCI to provide factual support for its claims. ECF No. 131 at 7-8. The Court more than once warned LCI that failure "to amend the Complaint and provide factual support . . . will result in dismissal with prejudice." *Id.*

LCI responded to the Court's warnings by missing the deadline for amending the Complaint. *See,* ECF No. 155, Ex. A at 3:19-20. The Court excused this irregularity when LCI's new counsel appeared and explained that his secretary had died. *Id.* at 4:22-5:6. Counsel then attempted to have the Court stay the litigation in favor of arbitration. *See,* ECF No. 158, Ex. A. The Court denied the request on account of the fact that LCI waived its arbitration rights by bringing a breach of contract claim. *Id.* at 14:10-15. LCI then sought leave to amend its Complaint for a third time "to allow us to add back in the breach of contract actions because the only reason [LCI] voluntarily dismiss[ed] [them] is we thought we were going to proceed under arbitration." *Id.* at 14:20-23. The Court permitted LCI to file a Motion for Leave to Amend the Complaint. *Id.* at 15:8-9, 16:4, 17:4-18:10. After some more

misunderstanding on LCI's part as to what it has to do at this point, *see,* Tr. Mot. Hr'g Oct 11, 2016, LCI filed its TAC.

As will be seen, the deficiencies in LCI's previous complaints remain in the TAC.

### III. <u>ANALYSIS</u>

LCI's latest pleading is a six-count complaint. Counts I, II (brought against the City and CPO Rhee only), and III are civil rights claims brought under 42 U.S.C. §§ 1981, 1983, and 1985(3), respectively. The remaining counts are breach of contract claims. Counts IV and V are premised on the Main Agreement and are asserted against the two signatories to that contract, the City of Chicago (Count IV) and Republic/Allied (Count V). Count VI alleges a breach of the Transport Agreement and is brought against LCI's counterparty to the agreement, RSPI.

Common elements underlie these claims. Counts I, II, and III require LCI to plead, among other things, that the Defendants were motivated by race when they acted to injure the company. Count IV and V require LCI to have the right to sue under the Main Contract. The Court first examines these common elements before turning to Count VI.

### A. Counts I, II, and III Must Be Dismissed for Lack of Adequate Pleading of Racial Animus

As the Court stated in its prior opinions, to carry the burden to plead a 42 U.S.C. §§ 1981, 1983, or 1985 claim, LCI must allege that the Defendants discriminated against it *because* its owners are African Americans. *See,* ECF No. 64 at 14-22, ECF No. 131 at 5-11; *see also*, *Morris v. Office Max,* 89 F.3d 411, 413-14 (7th Cir. 1996) (listing an intention to discriminate on the basis of race as one of the elements of a § 1981 action); *Sherwin Manor Nursing Ctr. v. McAuliffe,* 37 F.3d 1216, 1220 (7th Cir. 1994) ("To state an equal protection claim, a § 1983 plaintiff must allege that a state actor purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group."); *Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194, 203 (7th Cir. 1985) ("A successful Section 1985(3) claim requires the plaintiff to establish some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.") (internal quotation marks omitted). Moreover, such "[a]llegations of race discrimination must be supported by material facts, not mere conclusions." *See*, ECF No. 64 at 6 (citing *Jafree v. Barber,* 689 F.2d 640, 643 (7th Cir. 1982)). Yet despite having been instructed thusly, LCI again leans on the same allegations that were twice found to be

conclusory and insufficient to support an inference of racial animus.

Against NCC, the TAC continues to have nothing to say but that NCC failed to obtain insurance coverage necessary for LCI's trucks to operate in Missouri, raised LCI's premiums, and retained its deposit. While LCI alleges that NCC does not do these things to "white-owned contracts," it has pleaded no facts to support the allegation. LCI makes no effort to identify, even in a general manner, any such white-owned businesses. Nor does it allege that NCC was aware that LCI was owned by non-whites. *See, Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 757 (7th Cir. 2006) ("[T]he defendants could not have discriminated against Pourghoraishi on the basis of race if they were unaware of his race. . . .").

LCI attempts to supplement the allegations it makes against NCC in its response to NCC's Motion to Dismiss. This is plainly inappropriate, as the Court suspects LCI's experienced counsel knows. *Thomason v. Nachtrieb,* 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss. . . ."). In any case, the hastily added allegations are speculative and conclusory. They bring no support to LCI's case.

Against Seng, LCI contends that as there is "no plausible reason" for Seng to email Republic/Allied, the email itself must be racially motivated. The text of the email, however, refutes the contention that Seng did not have a legitimate reason to email Republic/Allied. Seng's email, consisting of seven sentences in total, reads in part, "Jesse [LCI's owner] tells me that, Republic, is not paying him timely, that you owe him over $700,000. . . . Please let me know if this is true, and what can be done to help." ECF No. 181-1. Even when it draws all reasonable inferences in favor of LCI, the Court cannot see how such an email rules out every "plausible reason" for Seng to have contacted Republic/Allied, thus leaving only race as the motivation for the communication. LCI's process-of-elimination argument to arrive at racial animus falls flat.

Likewise, the allegations made against CPO Rhee, the City of Chicago, Republic/Allied, and RSPI amount to nothing more than the bald and hackneyed assertion that the Defendants treated "LCI differently as compared to white-owned companies." *See,* TAC ¶¶ 37, 39, 46, 50-52, 48, 57, 66. Strangely enough, LCI attempts to shift the burden onto the Defendants, asserting that if "they were not discriminatory, the Defendants would certainly contend that such was [*sic*] conduct was done to non-MBEs also." ECF No. 175 at 10. LCI then faults the Defendants for not making the contending protests to LCI's satisfaction.

*Id.* But the burden to plead the necessary elements of its own claims rests squarely on LCI. *See, e.g.*, *Payne v. Abbott Labs.*, 999 F.Supp. 1145, 1152 (N.D. Ill. 1998) (Leinenweber, J.) (stating that the plaintiffs "must plead the elements of the prima facie case of discrimination").

Insofar as LCI's allegations are mere repetitions or cosmetic variants of the conclusory allegations found in the previous Complaints, the Court incorporates its stated reasons for rejecting them. *See,* ECF No. 64 at 14-17, 18-21 ("Plaintiffs fail to allege *facts* showing any kind of racial animus on the part of the City or the other Defendants.") (emphasis in original); ECF No. 131 at 5-12 ("Plaintiffs do not allege any *facts* to bolster the repeated conclusion that Defendants acted with racial animus.") (emphasis in original).

To the extent that LCI makes any new allegation in the TAC, it is the reliance the company now puts on the OIG reports. While it is true that the OIG documented problems with the MBE/WBE program, these problems do not show that any of the Defendants in this case harbor racial animosity. The problems that the OIG addressed involved the City of Chicago's poor administration of the program, which allowed MBE companies to sell their certifications to City contractors like Allied. The MBEs did no work themselves but still got paid for being MBE-certified. This "pass through" scheme benefited Allied and the

MBEs at the expense of the City of Chicago, its taxpayers (who footed the bill), and other MBEs that would have done the work, assuming that such MBEs existed. (The OIG obliquely expressed its doubt on the availability of such MBEs by recommending that the City demand less MBE participation than the statutory maximum and instead work to ascertain "how much MWBE capacity actually exists in those areas." ECF No. 149, Ex. E at 2.) Whites and blacks thus show up on both sides of the ledger, as those who (wrongly) benefited from the scheme and those who paid for it. The pass through scheme is discreditable, but not because it discriminated against racial minorities. As such, the scheme – and the OIG's condemnation of it – offer no support for LCI's allegations that the Defendants in this case discriminated against it on account of race.

In sum, LCI has once again failed to plead that the Defendants acted with the requisite racial animus. The Court thus dismisses Counts I, II, and III of its Complaint.

## B. Counts I, II, and III Must also be Dismissed for Other, Independent Reasons

Dismissal of Counts I and II as asserted against the City of Chicago is also appropriate because LCI has not alleged any municipal policy that deprived it of its constitutional rights. Likewise, Count III must be dismissed because LCI has not

averred any facts tending to show that the Defendants entered a conspiracy.

### 1. Municipal Policy

To state a civil rights claim against a municipality like the City of Chicago, LCI must alleged that the its rights were violated by a municipal policy, as that term is understood post *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). *See*, *id.* ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Looper Maint. Serv. v. City of Indianapolis,* 197 F.3d 908, 913 (7th Cir. 1999) ("[A]s in his Section 1983 claim, [Plaintiff] Looper must show that the violation of his right to make contracts protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.") (internal quotation marks omitted). Such a municipal policy may be found in one of three places: (1) in a City's express policy; (2) through a widespread practice that "is so permanent and well settled" as to constitute a "custom or usage" with the force of law; or (3) through the acts of a person with "final policymaking authority." *Baxter by Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 734 (7th Cir. 1994), *superseded by statute on other grounds*.

LCI does not allege that the harm to its federally protected rights flowed from an express policy of the City. Nor could it given that "the City's express policy on contracts not only prohibits discrimination against minorities, but actually requires the City to have a goal of granting contracts to MBEs." ECF No. 64 at 16; *see generally,* Municipal Code of Chicago § 2-92-420 *et seq.* (establishing a program that reserves certain contract awards to MBEs and WBEs).

This leaves two avenues for LCI to pursue in trying to make out a municipal policy: a City's implied policy in the form of a widespread practice carrying the force of law and the act of a final policymaker. LCI grabs for both options in its TAC. Unfortunately, the attempt is no more successful than it was previously. *See,* ECF No. 131 at 7 ("Like [in] the original Complaint, . . . Plaintiffs [have not] pleaded with any specificity the existence of a widespread practice of discrimination against minority-owned businesses; and they fail to plead factual support for their claim that CPO Rhee was a person with final policymaking authority for the City.").

LCI has not supplemented its factual pleadings of a widespread practice of racial discrimination with anything more than the OIG reports. But, as explained previously, the problems documented in those reports do not suggest that the City has a practice of discriminating against minorities. As

such, LCI's allegations of a municipal policy again lack "factual support that a city policy does exist" and so "are insufficient." *Rodgers,* 771 F.2d at 202.

LCI tries harder with its claim that CPO Rhee is a final policymaker. Recognizing that "the identity of a government's policymaker is a question of local law," *Auriemma v. Rice,* 957 F.2d 397, 400 (7th Cir. 1992), LCI points to Municipal Code of Chicago ("MCC") § 2-92-490. It is true that this section of the MCC lays out the duties of a Chief Procurement Officer. Yet, it is difficult to understand how LCI could read the section and think that CPO Rhee has final policymaking authority over the actions that LCI alleged caused it harm. Under MCC § 2-92-490, the CPO is tasked with administering the MBE/WBE program and carrying out various activities associated with MBE/WBE certification (*e.g.,* recruiting businesses to apply for certification, maintaining an electronic directory of certified businesses, etc.). None of these tasks suggest that CPO Rhee has the authority to make policy. MCC § 2-92-490 gives the CPO no power to "establish rules," "countermand the statutes," or "adopt[] rules for the conduct of government." *See, Auriemma,* 957 F.2d at 401 (listing these as the powers of a policymaker). Instead, the code rather clearly indicates that the CPO is an administrator of a program whose goals and policies are set by statute.

LCI further alleges that the Main Contract shows that CPO Rhee has policymaking power, as does a letter that the CPO wrote in response to LCI's inquiries. However, LCI cites no authority to support the proposition that a contract or a letter – as opposed to local law – may establish a local government employee as the final policymaker for the municipality. Furthermore, the contract provisions that LCI cites do not favor the theory that CPO Rhee may make policy binding the City. Consider, for example, Section 2.21 of the contract. As may be recalled, this provision permits (but does not require) the CPO to stop payment to a contractor if she has reason to believe that a subcontractor like LCI has not been paid. The provision does not say that whether the CPO chooses to do so in any particular instance then becomes a rule prescribing the conduct of the City. It does not hint at any policymaking authority on the part of the CPO.

The letter is even weaker evidence. LCI emphasizes a line from the letter which reads, "one of our top goals is making sure that minority-and women-owned businesses can grow and find a consistent, stable place in the market." TAC ¶ 49. This line simply echoes the goals behind the City's MBE/WBE policies as set out in the municipal codes. It and the rest of letter utterly fail to show that CPO Rhee has any policymaking authority.

Because LCI has not adequately pleaded that a City's policy violated its federally protected rights, the § 1981 and § 1983 claims against the City must be dismissed.

## *2. Conspiracy*

The Court next examines the civil conspiracy claim under § 1985(3). To establish a *prima facie* case of such a conspiracy, LCI must plead specific material facts to show an express or implied agreement among the Defendants to deprive it of its constitutional rights. *See, Scherer v. Balkema,* 840 F.2d 437, 442 (7th Cir. 1988); *Jafree,* 689 F.2d at 644. Such an agreement occurs when the Defendants had "a meeting of the minds" whereby they reached "an understanding to achieve the conspiracy's objectives." *See, Hernandez v. Joliet Police Dep't,* 197 F.3d 256, 263 (7th Cir. 1999).

LCI's allegations of facts supporting a conspiracy among the Defendants can be summed up in four words: they knew each other. *See,* TAC ¶¶ 59-69. For example, LCI says that NCC "has a long-standing relationship with Defendant Republic and/or Defendant Republic/Allied." TAC ¶ 67. Likewise, "Defendants Republic/Allied and Defendants Seng were enough acquainted with each other so that Seng could send an email to a specific person, Todd Bruck of Defendant Republic/Allied." ECF No. 174 at 8. But simply because the Defendants know each other does not give rise to the inference that they agreed to "obstruct LCI

operations and attempt to render LCI insolvent" all so Republic/Allied could "eliminate the only qualified MBE to bid for the City garbage hauling contract." TAC ¶ 59; *see, Hernandez,* 197 F.3d at 263-64 (finding no evidence to support an inference of a conspiracy when there was "no evidence that [the alleged conspirators] had anything more than a working relationship" and "nothing in this record explains why [one defendant] would go out on a limb to prepare a false police report at [the other defendant's] behest").

Besides these scattershot allegations as to the Defendants' knowledge of each other and the conclusory statement that Republic/Allied recruited the Defendants to break the law on its behalf, all LCI can point to show agreement is what it considers suspicious timing in the Defendants' actions. Specifically, LCI asserts that "Defendants had no issues with Plaintiff for six months while the bid was pending, but one week after Defendant Republic/Allied was awarded the contract with the City, Defendant Republic/Allied fails to pay Plaintiff for $1.4 million in invoices, Plaintiff's work is questioned, [and] Defendant Seng contacts Defendant Republic/Allied contending that it is owed money by Plaintiff." *See, e.g.,* ECF No. 175 at 11-12 (the same sentence is found verbatim in all four of LCI's responsive briefs to the Defendants' motions to dismiss).

LCI's assertion is simply not true. All these events did not take place within a week of Republic/Allied winning the City's contract. Republic/Allied won the contract in March 2010. It allegedly failed to pay LCI the $1.4 million four years later, sometime in 2014. Likewise, Seng emailed Republic/Allied in 2014, and NCC appeared to have committed its alleged wrongdoings in that year. Although LCI did not specify exact dates, the events in 2014 do not appear to have happened within a week of each other either. Finally, it is not true that the Defendants had no issues with LCI "for six months while the bid was pending." At least one of the Defendants, RSPI, had enough "issues" with LCI to send it a notice letter of breach four months after signing the Transport Agreement with LCI and before the City's contract was to begin.

In sum, even if suspicious timing were enough to raise an inference of conspiracy, LCI has not aroused any such suspicion. *But see, Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556-57 (2007) (stating that "[w]ithout more, parallel conduct does not suggest conspiracy"); *Adamski v. McGinnis,* No. 13-CV-962-JPS, 2015 U.S. Dist. LEXIS 40501, at *10 (E.D. Wis. Mar. 30, 2015) (applying *Twombly*'s language to dismiss a § 1985 claim). LCI's § 1985(3) conspiracy claim fails because, as with its previous Complaints, LCI has not "offer[ed] a single fact to support the inference that the City or CPO Rhee and the private-actor Defendants

- 25 -

entered into [] an agreement" to violate its constitutional rights.  ECF No. 131 at 9-10.

### C. Counts IV and V must be Dismissed because LCI may not bring a Breach of Contract Claim under the Main Contract

Having disposed of LCI's civil rights claims, the Court next turns its attention to the breach of contract causes of action.  LCI's breach of contract claims as alleged in Counts IV and V of the TAC run into two obstacles:  (1) the claims were previously dismissed with prejudice; and (2) LCI is not a third-party beneficiary to the contract under which it seeks to sue (the Main Contract).  The Court is of the view that LCI has not overcome either of these problems.

#### 1.  Prior Dismissal with Prejudice

In its March 2016 order, the Court dismissed with prejudice LCI's claims against the City and Republic/Allied for breach of the Main Contract.  ECF No. 64 at 21-22.  (While the Court stated that the dismissal against Allied was without prejudice, that dismissal was in regards to breaches premised on the Transport Agreement. *Id.* at 22, 25.)  LCI has not received permission from this Court (or any other) to refile these claims.  *See, Marlow v. Winston & Strawn,* 19 F.3d 300, 306 (7th Cir. 1994) ("[O]nce the order of dismissal [with prejudice] was entered it had the same effect as an adjudication on the merits, which could be altered only by filing a motion to reopen the

judgment pursuant to Rule 59, or doing as Marlow did and take an appeal."). LCI contends that it is nonetheless entitled to file Counts IV and V because, whereas before it sued as a direct party to the Main Contract, it is now asserting standing to sue as a third-party beneficiary.

The argument is unpersuasive. The Court's Order dismissing the claims clearly stated that the Court considered both whether LCI was a party to the Main Contract and whether it was a third-party beneficiary to that contract. *See,* ECF No. 64 at 21. The Court found that LCI was neither and so dismissed its claims with prejudice. LCI should not be allowed to bring the same claims now without court approval.

### 2. *Third-Party Beneficiary*

Even if the Court were to reconsider the claims, still it would find that LCI does not have standing to sue for alleged breaches of the Main Contract. Since LCI is not a signatory to the Main Contract, it can enforce the contract only if "the contract's original parties intentionally entered into the contract for [its] direct benefit." *Martis v. Grinnell Mut. Reinsurance Co.,* 388 Ill. App. 3d 1017, 1020 (2009); *see also, XL Disposal Corp. v. John Sexton Contractors Co.,* 168 Ill. 2d 355, 361 (1995). But as the Seventh Circuit has remarked, "Illinois has made it very difficult to prove intent to benefit the third party." *Quinn v. McGraw-Hill Cos.,* 168 F.3d 331, 334

(7th Cir. 1999).  This is because "there is a strong presumption that parties to a contract intend that the contract's provisions apply to *only* them and not to third parties."  *155 Harbor Drive Condo. Ass'n v. Harbor Point, Inc.,* 209 Ill. App. 3d 631, 647 (1991) (emphasis as added in *155 Harbor Drive*) (quoting from *Ball Corp. v. Bohlin Building Corp.,* 187 Ill. App. 3d 175, 177 (1989)) (internal quotation marks omitted).  To overcome this strong presumption, a nonparty like LCI must point to language in the Main Contract and "the circumstances surrounding the parties at the time of its execution" that together constitute "practically an express declaration" that the City and Republic/Allied entered into that contract for LCI's direct benefit.  *See, id.; XL Disposal,* 168 Ill. 2d at 361; *Martis,* 388 Ill. App. 3d at 1020.

The strongest evidence LCI has of this "express declaration" is Section 5.1 of the Main Contract.  Section 5.1 reads, in part:  "This provision is intended [to] the benefit of any MBE/WBE affected by underutilization and grants such entity specific third party beneficiary rights."  LCI argues that because it has "specific third party beneficiary rights" as conferred by Section 5.1, it may sue to enforce all other provisions of the Main Contract.

This argument fails for two reasons.  First, Section 5.1 gives LCI the right to *arbitrate* an underutilization claim.  The

sentence immediately preceding the one just quoted stipulates that, "[t]he Ordinance and contracts subject thereto provide that any disputes between the contractor and such affected [by underutilization] MBEs/WBEs regarding damages shall be resolved by binding arbitration." Thus, Section 5.1 has nothing to say as to whether LCI may *litigate* its underutilization claim as a third-party beneficiary to the Main Contract. Moreover, Section 5.1's careful language giving LCI the "specific third party beneficiary rights" to complain of underutilization suggests that LCI's rights as a third-party beneficiary are limited to just that claim. In other words, it appears that LCI has the "specific" right conferred by Section 5.1 to arbitrate a particular claim but not the general right to enforce all of the provisions of the Main Contract.

Because LCI has not convinced the Court that Section 5.1 alone gives it third-party beneficiary status, the Court considers the rest of the Main Contract. That contract and the circumstances surrounding its signing are similar to those found in *ESG Tech. Servs., LLC v. Advantage Health Sols., Inc.*, No. 1:09-cv-00030-TWP-TAB, 2011 U.S. Dist. LEXIS 59619 (S.D. Ind. June 6, 2011). As in this case, the plaintiff in *ESG* was a MBE owned by an African American. *Id.* at *2. The companies that ESG sued, like Republic/Allied, had listed ESG as a MBE subcontractor in their bid for a contract with the state of

Indiana. *Id.* at *3. These defendant companies won the state contract and so ESG's name was included in the list of MBEs participating in the contract. *Id.* at *5. Ultimately, however, ESG did not contract with the defendants to perform the subcontracting work. *Id.* at *8. ESG then sued, asserting a claim of breach of the contract between the defendants and the state. *Id.* at *10. At summary judgment, the issue was whether ESG was an intended third-party beneficiary to the contract.

Judge Pratt determined that ESG was not such a beneficiary. *ESG,* 2011 U.S. Dist. LEXIS 59619 at *20. ESG, like LCI in this case, made much of the fact that its name was listed in the contract with the state as a participating MBE. However, the judge reasoned that "[t]he fact that ESG is mentioned in the contract . . . does not establish an intent to benefit ESG as a third-party beneficiary; rather, naming a party is merely evidence of such an intent." *Id.* at *14; *see also, E.B. Harper & Co. v. Nortek, Inc.,* 104 F.3d 913, 920 n.4 (7th Cir. 1997) (finding that a plaintiff is not a third-party beneficiary to a contract despite being mentioned "incidentally in the Stock Purchase Agreement between Nortek and the Pozzis as the broker involved in the deal"); *Martis,* 388 Ill. App. 3d at 1020 (stating that "[i]f a contract makes no mention of the plaintiff or the class to which he belongs, he is not a third-party beneficiary of the contract" but not that if a contract does

make such a mention, then the plaintiff automatically is a beneficiary). Judge Pratt found that rest of the contract militated against the conclusion that the parties intended to benefit ESG.

As is relevant for our case, the judge found the following instructive. First, in a 22-page contract with 53 provisions, ESG was named only in the provision that addressed MBE and WBE participation. *ESG Tech. Servs.,* 2011 U.S. Dist. LEXIS 59619 at *15. Second, the contract allowed the defendants to swap out the participating MBEs and WBEs provided that the defendants obtain written approval from the state. *Id.* at *15-16. Third, other provisions to the contract "detail[ed] the rights and obligations of the parties." *Id.* at *16-17.

The Court finds *ESG* relevant and persuasive. The difference in procedural posture between this case and *ESG* does not outweigh their similarities. This is especially true given that the evidence relied on in *ESG* was simply the terms of the contract and that the reasoning from *ESG* has been adopted to decide a motion to dismiss. *See, Bucher & Christian Consulting, Inc. v. Novitex Enter. Sols.,* No. 1:15-cv-00010-TWP-MJD, 2015 U.S. Dist. LEXIS 118378, at *20-39 (S.D. Ind. May 22, 2015) (recommending dismissal of a plaintiff's breach of contract claim), *adopting recommendation,* 2015 U.S. Dist. LEXIS 117578, at *3-4 (S.D. Ind. Sep. 3, 2015).

Many of the factors that swayed the *ESG* court to find that the MBE plaintiff was not an intended third-party beneficiary are present in this case. The Main Contract is over a hundred pages long, and LCI's name is mentioned only in an insert to the contract. Moreover, the Main Contract permits Republic/Allied to substitute MBE subcontractors if it gives notice to the City. *See,* ECF No. 149, Ex. C at 48. This indicates that the parties did not intend to benefit a specific MBE such as LCI. Finally, the bulk of the Main Contract revolves around the rights and responsibilities of the parties themselves, not LCI. Overall, the Main Contract is a document that is "perfectly reasonable" for the parties to have entered on their own behalf. *See, Quinn,* 168 F.3d at 334-35 (rejecting that a plaintiff may claim third-party beneficiary status when, among other things, the contract was "a perfectly reasonable – perhaps even indispensable – contract for AHAC to have entered for its own purposes").

Insofar as the Main Contract reflects rules that the City set down regarding MBE participation, those rules make LCI, one MBE out of the class of many, an incidental beneficiary of the contract. Such a beneficiary cannot sue to enforce the contract. *See, Martis,* 388 Ill. App. 3d at 1020. LCI stands in the same shoes as the physician in *Martis* who provided medical services to an injured employee covered by the defendant

insurer. Such a physician benefitted from the insurance contract (he got paid by the insurance) but may not sue on it because his benefit was only incidental. *See, id.* at 1021-23. As the *Martis* court stated, "medical providers are generally not third party beneficiaries of insurance policies . . . [except] when (1) the policy expressly identifies medical providers as third party beneficiaries . . . or (2) the policy provides for payment directly to medical providers." *Id.* at 1022. Neither exception applies to LCI. LCI is not expressly named as a third-party beneficiary (no MBE is), and it receives no payment directly from the City. Like the medical provider then, LCI benefits from the Main Contract but cannot sue on it.

To the extent that the contract lays out the requirements on subcontractors (MBEs and non-MBEs alike), its language indicates that it is the contractor's (Republic/Allied's) responsibility to ensure that the subcontractors comply with those requirements. Such provisions do not suggest that the City has any legally enforceable rights against non-signatory subcontractors like LCI and so do not "bind" LCI and make it a third-party beneficiary to the contract. *See, Barney v. Unity Paving,* 266 Ill. App. 3d 13, 19-23 (1994) (holding that the plaintiff has not overcome the strong presumption against third-party beneficiaries when "the contract as a whole clearly shows that the intent of the City . . . was solely to set forth the

*parties'* respective responsibilities and to protect the City")
(emphasis added).

For these reasons, LCI cannot sustain its breach of
contract claims under the Main Contract against either the City
or Republic/Allied.

### D.    The Dismissals are with Prejudice.

The Court has twice dismissed LCI's claims with leave to
amend and clear instructions to cure the persistent deficiencies
in its pleading.    LCI yet again fails to do so.    Accordingly,
the Court now does what it before warned LCI that it would do in
the face of such failures:    the Court dismisses Counts I through
V of the TAC with prejudice.    *See, Airborne Beepers & Video,*
*Inc. v. AT&T Mobility LLC,* 499 F.3d 663, 666-67 (7th Cir. 2007)
("Where the plaintiff has repeatedly failed to remedy the same
deficiency, the district court did not abuse its discretion by
dismissing the claim with prejudice.") (internal quotation and
alteration marks omitted).    LCI may not amend its pleadings in
the absence of a written motion explaining how it would cure the
defective allegations.    *See, Jafree,* 689 F.2d at 644-45; *Looper,*
197 F.3d at 914; *Airborne,* 499 F.3d at 666-68.

### E. Count VI Survives Only to the Extent that LCI is Alleging that RSPI Breached the Terms of the Transport Agreement

The Court arrives at the last cause of action.    Count VI of
the TAC alleges that *RSPI* breached the *Transport Agreement*.    The

emphases are necessary because in pleading this claim, LCI indiscriminately mixes allegations of breaches by Defendant *Republic/Allied* under the *Main Contract*. As may be remembered, Republic/Allied is actually shorthand for four entities, none of which is RSPI and none of which is a party to the Transport Agreement. To justify throwing in Republic/Allied to this cause of action, LCI blandly asserts that "[a]ny misinterpretation of the Defendants' roles is purely the result of Movants' doing." ECF No. 176 at 15. The Court agrees that if a plaintiff's own "misinterpretation" and confusion were cognizable grounds to sue somebody, then LCI's case would have gone a lot better for it in the year and a half since the case has been pending. They are not.

In addition, the Transport Agreement is not the Main Contract. These contracts are two legally distinct documents. Typically "documents executed at the same time by *the same parties* concerning the same subject matter will be construed as one." *Home Sav. Assn., F.A. v. State Bank of Woodstock,* 763 F.Supp. 292, 296-97 (N.D. Ill. 1991) (emphasis in original) (citing *Main Bank of Chicago v. Baker,* 86 Ill. 2d 188, 201 (1981)). The Transport Agreement and the Main Contract were executed months apart, entered into by different parties, and concerned different subject matters. There is no reason why the

two contracts should be treated as the same document that imposed cumulative obligations on RSPI.

What does impose obligations on RSPI are the contract provisions found in the Transport Agreement and its amendments. But these provisions do not include any duty to mentor LCI. LCI has made several factual allegations to support the charge that RSPI (or was it Republic/Allied?) ought to have mentored LCI. *See,* TAC ¶¶ 37, 38(O); ECF No. 149 Ex. B & Ex. Q. However, no such mentoring obligation was incorporated into the Transport Agreement. LCI is here alleging breaches of that specific agreement and so cannot rely on supposed duties not found in the agreement.

For the above reasons, the Court strikes all of the allegations from Count VI that do not concern an obligation imposed on RSPI by the Transport Agreement. What remains in Count VI, which include the allegations that RSPI violated the exclusivity clause of the Transport Agreement and wrongfully terminated the contract, may proceed. LCI has sufficiently pleaded a breach of the exclusivity clause by alleging that RSPI "hired another hauler to do LCI's work for which LCI had the exclusive hauling contract per Section 1(b) of the July 19, 2010 Settlement Agreement [an amendment to the Transport Agreement]." TAC ¶ 38(H). Likewise, it has alleged wrongful termination by disputing that it breached any of the three provisions in the

Transport Agreement that RSPI relied on to terminate the contract. *See,* ECF No. 149 Ex. H.

### IV.  CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.    Counts I through V of the Third Amended Complaint are dismissed with prejudice; and

2.    The remaining Count VI, as limited to allegations of RSPI's breaches of the Transport Agreement, may proceed.


**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 3/31/2017